## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

TRACEY K.,[1]
     Plaintiff,

        v.                           Civil No. 3:21-cv-00687-HEH

KILOLO KIJAKAZI,
Acting Commissioner of the
Social Security Administration,
     Defendant.

### REPORT AND RECOMMENDATION

This is an action seeking review of the decision of the Commissioner ("Commissioner") of the Social Security Administration ("SSA") denying Plaintiff's application for disability insurance benefits under the Social Security Act ("Act"). At the time of her application date on April 23, 2015, Plaintiff was fifty years old and was last insured on March 31, 2014. (R. at 145.) Plaintiff alleges she is unable to work due to obesity, hypertension, neuropathy, compartment syndrome, back pain, depression, and post traumatic stress disorder ("PTSD"). (R. at 146.)

On August 19, 2019, an Administrative Law Judge ("ALJ") issued a decision finding that Plaintiff was not disabled. (R. at 184.) This matter comes before the Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) on cross motions for summary judgment, rendering the matter ripe for review.[2]

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

[2] The administrative record in this case remains filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these rules, the Court will exclude personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and financial account numbers from this Report and Recommendation, and will

For the reasons set forth below, the Court RECOMMENDS that Plaintiff's Motion for Summary Judgment (ECF No. 18) be DENIED, Defendant's Motion for Summary Judgment (Def.'s Mem. Supp. Summ. J. (ECF No. 19) ("Def.'s Mem.")) be GRANTED and the final decision of the Commissioner be AFFIRMED.

## I. PROCEDURAL HISTORY

Plaintiff filed an application for disability insurance benefits on April 23, 2015, alleging disability beginning May 8, 2013. (R. at 145.) The SSA denied Plaintiff's claims initially and again upon reconsideration. (R. at 145, 165.) Plaintiff requested a hearing before an ALJ, and a hearing was held on July 6, 2017. (R. at 83-144, 214.) On December 6, 2017, the ALJ issued a written opinion, holding that Plaintiff was not disabled under the Act. (R. at 169-79.) On June 13, 2018, the Appeals Council remanded the case to the ALJ for further proceedings in accordance with its remand order. (R. at 180-83.) Plaintiff attended and testified at a subsequent hearing on April 29, 2019. (R. at 8-60.) On August 19, 2019, the ALJ issued a written decision again finding Plaintiff not disabled. (R. at 187-98.) On September 1, 2021, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision as the final decision of the Commissioner. (R. at 1-3.) Plaintiff now seeks judicial review pursuant to 42 U.S.C. § 405(g).

## II. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, a court will affirm the SSA's "disability determination 'when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence.'" *Mascio v. Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012)).

---

further restrict its discussion of Plaintiff's medical information only to the extent necessary to properly analyze the case.

Substantial evidence requires more than a scintilla but less than a preponderance of evidence and includes the kind of relevant evidence that a reasonable mind could accept as adequate to support a conclusion. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). Indeed, "the substantial evidence standard 'presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts. An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision.'" *Dunn v. Colvin*, 607 F. App'x. 264, 274 (4th Cir. 2015) (quoting *Clarke v. Bowen*, 843 F.2d 271, 272-73 (8th Cir. 1988)).

To determine whether substantial evidence exists, the court must examine the record as a whole, but may not "undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)). In considering the decision of the Commissioner based on the record as a whole, the court must take into account "whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)). The Commissioner's findings as to any fact, if substantial evidence in the record supports the findings, bind the reviewing court to affirm regardless of whether the court disagrees with such findings. *Hancock*, 667 F.3d at 476. If substantial evidence in the record does not support the ALJ's determination or if the ALJ has made an error of law, the court must reverse the decision. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

SSA regulations set forth a five-step process that the agency employs to determine whether disability exists. 20 C.F.R. § 404.1520(a)(4); *see Mascio*, 780 F.3d at 634-35 (describing the ALJ's five-step sequential evaluation). To summarize, at step one, the ALJ looks at the

claimant's current work activity. *Id.* § 404.1520(a)(4)(i). At step two, the ALJ asks whether the claimant's medical impairments meet the regulations' severity and duration requirements. *Id.* § 404.1520(a)(4)(ii). Step three requires the ALJ to determine whether the medical impairments meet or equal an impairment listed in the regulations. *Id.* § 404.1520(a)(4)(iii). Between steps three and four, the ALJ must determine the claimant's residual functional capacity, accounting for the most the claimant can do despite her physical and mental limitations. *Id.* § 404.1545(a).

At step four, the ALJ assesses whether the claimant can perform her past work given her residual functional capacity. *Id.* § 404.1520(a)(4)(iv). The burden of proof remains with the claimant through step four of the analysis, such that she must prove that her limitations preclude her from past relevant work. *Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987); *Hancock*, 667 F.3d at 472 (citation omitted). If such work can be performed, then benefits will not be awarded, and the analysis ends at step four. 20 C.F.R. § 404.1520(e). However, if the claimant cannot perform her past work, the analysis proceeds to step five, and the burden then shifts to the Commissioner to show that the claimant is capable of performing other work that is available in the national economy. *Id.* § 404.1520(a)(4)(v).

### III. THE ALJ'S DECISION

The ALJ followed the five-step evaluation process established by the Act in analyzing Plaintiff's disability claim. (R. at 189-98.) *See* 20 C.F.R. §§ 404.1520(a)(4); *Mascio*, 780 F.3d at 636 (describing the ALJ's five-step sequential evaluation). At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity from Plaintiff's alleged onset date of disability (May 8, 2013) through her date last insured (March 31, 2014) ("the relevant period"). (R. at 189.) At step two, the ALJ determined that Plaintiff had the following severe impairments pursuant to 20 C.F.R. § 404.1520(c): major joint dysfunction, obesity, "affective orders

(diagnosed as depression and/or [PTSD])", and anxiety. (R. at 189-90.) At step three, the ALJ determined that Plaintiff did not have an impairment, individually or in combination, which met or equaled a disability listing in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526). (R. at 190.)

The ALJ then determined Plaintiff's residual functional capacity. (R. at 191-92.) Based on the evidence in the record, the ALJ determined that Plaintiff retained the ability to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) but with the following limitations:

> [Plaintiff] cannot operate foot controls with the right foot; she can occasionally climb stairs or ramps but never ladders, ropes, or scaffolds; she can occasionally balance or stoop but never kneel, crouch, or crawl; she cannot tolerate exposure to hazards (such as unprotected heights or moving machinery); she requires a cane to ambulate; she can concentrate on work-related tasks for periods of two hours before requiring a break; and she can have occasional interaction with supervisors, coworkers, and the public.

(R. at 191-92.)

The ALJ explained that she determined Plaintiff's residual functional capacity after considering "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," in accordance with the regulations. (R. at 192.) The ALJ also "considered the medical opinion(s) and prior administrative medical finding(s)" in accordance with the regulations. (R. at 192). Based on her residual functional capacity findings, the ALJ concluded at step four that Plaintiff could not perform any past relevant work as it was actually and generally performed in the national economy. (R. at 196-97.)

At step five, the ALJ determined that there were other jobs in significant numbers in the national economy that Plaintiff could have performed within the sedentary work category. (R. at 197.) As part of this process, the ALJ considered the testimony of a vocational expert, who

testified that given Plaintiff's age, education, work experience, and residual functional capacity, Plaintiff could perform the requirements of occupations such as addressor, order clerk, and charge account clerk. (R. 197-98.) Therefore, the ALJ concluded that Plaintiff was not disabled under the Act during the relevant period. (R. at 198.)

## IV. ANALYSIS

Plaintiff argues two issues warrant remand. (Pl.'s Mem. Supp. Summ. J. at 4-5, ECF No. 18 ("Pl.'s Mem.").) First, she contends the ALJ erred by "not allowing" counsel for Plaintiff to question the vocational expert regarding vocational information outside of the Dictionary of Occupational Titles ("DOT"). (Pl.'s Mem. at 4-5.) Second, Plaintiff argues that substantial evidence does not support the ALJ's findings, and that the ALJ failed to "employ[] the correct legal standard in reaching [her] decision." (Pl.'s Mem. at 5.) In particular, she avers the ALJ failed to perform a function-by-function assessment of Plaintiff's residual functional capacity and did not provide "a logical explanation as to how [Plaintiff's] daily activities established that [Plaintiff] had the capacity to work on a sustained basis throughout a normal work week." (Pl.'s Mem. at 9.) Plaintiff adds that the ALJ failed to address a "serious conflict" between the sedentary residual functional capacity assessment and the ALJ's determination that Plaintiff could not perform her past sedentary work. (Pl.'s Mem. at 14.)

As to Plaintiff's first point, Defendant responds that the ALJ appropriately relied on the DOT and the vocational expert's thirty-four years of experience when finding that there were jobs available in the national economy that Plaintiff could perform. (Def.'s Mem. at 15-16.) Second, Defendant argues: (1) substantial evidence supports the ALJ's residual functional capacity assessment; (2) the ALJ sufficiently explained her reasoning to permit meaningful review; and (3) there is no conflict between the assessed residual functional capacity and the

ALJ's step four findings. (Def.'s Mem. at 17-23.) For the reasons that follow, this Court finds that the ALJ did not err and substantial evidence supports her residual functional capacity findings.

### A. The ALJ Did Not Err in her Step Five Findings.

Plaintiff first argues that the ALJ erred by refusing Plaintiff's counsel the opportunity to: (1) "submit evidence concerning the reliability of occupational information contained in the [DOT];" and (2) cross-examine the vocational expert regarding information contained within the Department of Labor Occupational Information Network ("O*Net"). (Pl.'s Mem. at 5-7.) Consequently, "[t]his decision by the ALJ create[d] an unresolved conflict between [the ALJ's] refusal to allow reliable occupational information and regulations requiring the use of reliable information." (Pl.'s Mem. at 7.) In essence, Plaintiff argues that the ALJ had an affirmative duty, pursuant to 20 C.F.R. § 404.1566(d), to allow her attorney "to question the vocational expert as to conflicts between the information contained in the DOT and [O*Net]" because the O*Net is a source of reliable occupational information recognized by the Agency. (Pl.'s Mem. at 5-7.)

At the outset, Defendant responds that the ALJ did not deny Plaintiff's counsel the opportunity "to question the vocational expert about O*Net during the administrative hearing." (Def.'s Mem. at 14.) Moreover, Defendant maintains that the ALJ followed "the relevant regulations with respect to vocational evidence" which included taking administrative notice of the DOT and relying on the vocational expert's thirty-four years of experience. (Def.'s Mem. at 15-16.) Defendant contends the regulations "do <u>not</u> give an ALJ the authority to rely on O*Net . . . ." (Def.'s Mem. at 15) (emphasis in original.)

*1. Regulatory Framework.*

At step five of the sequential evaluation, the Commissioner bears the burden of establishing the existence of jobs in the national economy that an individual with Plaintiff's impairments can perform. *See Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981) (citing *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976); *Taylor v. Weinberger*, 512 F.2d 664, 666 (4th Cir. 1975)); *see also* 20 CFR §§ 404.1520(a)(4), 404.1520(g), 404.1560, 404.1560(c). The relevant regulations provide:

> (d) Administrative notice of job data. When we determine that unskilled, sedentary, light, and medium jobs exist in the national economy (in significant numbers either in the region where you live or in several regions of the country), we will take administrative notice of reliable job information available from various governmental and other publications. For example, we will take notice of —
>
> > (1) [DOT], published by the Department of Labor;
> > (2) County Business Patterns, published by the Bureau of the Census;
> > (3) Census Reports, also published by the Bureau of the Census;
> > (4) Occupational Analyses, prepared for the [SSA] by various State employment agencies; and
> > (5) Occupational Outlook Handbook, published by the Bureau of Labor Statistics.
>
> (e) Use of vocational experts and other specialists. If the issue in determining whether you are disabled is whether your work skills can be used in other work and the specific occupations in which they can be used, or there is a similarly complex issue, we may use the services of a vocational expert or other specialist. We will decide whether to use a vocational expert or other specialist.

20 C.F.R. § 404.1566.

The DOT[3] was developed by the U.S. Department of Labor in 1938.[4] It "is a vocational dictionary that lists and defines all jobs available in the national economy and specifies what

---

[3] The complete DOT revised fourth edition is found at https://occupationalinfo.org/ (last accessed Jan. 26, 2023).

[4] *Occupational Information System Project*, Soc. Sec. Admin, https://www.ssa.gov/disabilityresearch/occupational_info_systems.html (last accessed Jan. 26, 2023).

8

qualifications are needed to perform each job." *Zirnsak v. Colvin*, 777 F.3d 607, 616 (3d Cir. 2014) (citations omitted). In 1991, the Department of Labor discontinued updating the DOT and replaced it in 1998 with another job placement tool, the O*Net.[5] Though the Department of Labor states "[t]he DOT was replaced by the O*Net," SSA determinations are specifically carved out of this blanket statement.[6] Consequently, the Department of Labor announced that the "[SSA] is developing a new Occupational Information System (OIS), which will replace the DOT as the primary source of occupational information for use in the SSA disability adjudication process." *Id.* Accordingly, it is apparent that O*Net was not developed to replace the DOT with respect to SSA determinations. *Id.*[7]

In 2000, the SSA issued SSR 00-4p, 2000 SR LEXIS 8[8] clarifying the standards for using vocational expert testimony "and other reliable sources of occupational information in the evaluation of disability claims." SSR 00-4p, 2000 SSR LEXIS 8, *Titles II & XVI: Use of Vocational Expert and Vocational Specialist Evidence, And Other Reliable Occupational Information In Disability Decisions*, 2000 WL 1898704, at *1 (SSA Dec. 4, 2000) [hereinafter "SSR 00-4p"]. It specified that 20 C.F.R. § 404.1566(d) provides that the SSA "will take

---

[5] O*Net is found online at https://www.onetonline.org (last accessed Jan. 26, 2023).

[6] *Dictionary of Occupational Titles - Fourth Edition, Revised 1991: Status of the Dictionary of Occupational Titles; Use in Social Security Disability Adjudications*, U.S. Dep't of Labor, https://www.dol.gov/agencies/oalj/topics/libraries/LIBDOT (last accessed Jan. 26, 2023).

[7] *See Occupational Information System Project*, Soc. Sec. Admin, https://www.ssa.gov/disabilityresearch/occupational_info_systems.html (last accessed Jan. 26, 2023).

[8] Social Security Rulings are "final opinions and orders and statements of policy and interpretations" that the SSA has adopted. 20 C.F.R. § 402.35(b)(1). Once published, these rulings are binding on all components of the SSA. *See Heckler v. Edwards*, 465 U.S. 870, 873 n.3, 104 S. Ct. 1532, 79 L. Ed. 2d 878 (1984); 20 C.F.R. § 402.35(b)(1). "While they do not have the force of law, they are entitled to deference unless they are clearly erroneous or inconsistent with the law." *Pass v. Chater*, 65 F.3d 1200, 1204 n.3 (4th Cir. 1995).

administrative notice of 'reliable job information' available from various publications, including the DOT. In addition, as provided in 20 C.F.R. §[] 404.1566(e) . . , we use [vocational experts] . . . as sources of occupational evidence in certain cases." SSR 00-4p, at *2.

Among its directives, SSR 00-4p instructs that a vocational expert's evidentiary testimony "generally should be consistent" with the occupational information contained in the DOT. SSR 00-4p, at *2. SSR 00-4p makes clear that "[w]hen a [vocational expert] . . . provides evidence about the requirements of a job or occupation, the [ALJ] has an affirmative responsibility to ask about any possible conflict between that [vocational expert] . . . evidence and the information provided in the DOT." SSR 00-4p, at *4. The Fourth Circuit has found that "an ALJ has not fulfilled his affirmative duty 'merely because the [vocational expert] responds 'yes' when asked if her testimony is consistent with the [DOT].'" *Pearson v. Colvin*, 810 F.3d 204, 208-09 (4th Cir. 2015) (quoting *Moore v. Colvin*, 769 F.3d 987, 990 (8th Cir. 2014) (alterations, omissions, and emphasis omitted)). Accordingly, "[t]he ALJ independently must identify conflicts between the expert's testimony and the [DOT]." *Id.*

### 2. Vocational expert testimony.

During the April 21, 2019 administrative hearing, vocational expert Adina Leviton, Ph.D. ("Dr. Leviton") testified that a hypothetical individual with Plaintiff's age, education, prior experience, and residual functional capacity could perform three sedentary jobs existing in substantial numbers in the national economy: (1) addresser; (2) order clerk; and (3) charge account clerk. (R. at 54-56.) Dr. Leviton affirmed that her testimony was consistent with the DOT, as well as her thirty-four years as a vocational rehabilitation counselor. (R. at 56.) Plaintiff's counsel then began to cross examine Dr. Leviton regarding the positions she identified. (R. at 57.) In relevant part, the exchange proceeded as follows:

Q: Dr. Leviton, the job of – the jobs that you mentioned were based on the [DOT]? Is that correct?

A: Yes.

Q: Okay. Are you familiar with O-Net?

A: I am.

Q: And the position of addresser, is that a –well, briefly describe, I guess, what an addresser does.

A: Well, according to the DOT definition, an addresser would be somebody who would be putting mailing labels on bulk mailing product, packages and envelopes and notices and –

Q: And in your experience, does that job still exist?

A: In some companies it does, yes.

Q: And that person's job is exclusively to put those addresses on pieces of postage and other documents?

A: Primarily, yes.

Q: Generally speaking though, the person who's going to do that type of job is also gonna have other responsibilities?

A: They may have a few other responsibilities, but again, it's an unskilled job, so it's going to not be anything outside the parameters of what's in the hypothetical.

Q: Okay. Well, could there be more walking and standing?

A: It's still a sedentary job.

Q: Even according to the O-Net?

A: Doesn't matter what the O-Net says.

(R. at 57.)

Q: Okay. Well –

A: I only have to go by the DOT.

Q: I, I understand that but in your experience as a vocational expert –

A: As a vocational expert, the O-Net is useless to me.

Q: Why is that?

A: Because it doesn't sort things by skill – exertional skills, it doesn't allow me to sort by physical demands that I need. Just for a quick example, a truck driver in the O-Net is a sedentary job. So it's – for my practical purposes, it's not as helpful as it would be for somebody doing career counseling. Besides which, the Department of Labor, Social Security, the DOT is what they go by.

Atty: I understand that, but, but you—

ALJ: No. Counsel, we're not, we're not going further down this O-Net path. It – the DOT is what is acceptable by the Social Security, and that's what her testimony is based on.

. . .

(R. at 58.)

[Atty]: Is the DOT current?

A: No.

(R. at 58-59.)

11

   *3.   Analysis.*

   Plaintiff argues that the ALJ was "required to take administrative notice of several sources of *reliable* job information, including the [DOT]." (Pl.'s Mem. at 6) (emphasis in original). She adds that the ALJ's "rationale for refusing [Plaintiff]'s attempts to submit [O*Net] information through cross examination of the vocational expert is inconsistent with the regulation's requirements for 'reliable' occupational information." (Pl.'s Mem. at 6.) To support her argument, Plaintiff contends that the "[SSA] itself has declared the DOT as being outmoded[,]" so the ALJ's "statement that O*NET was not a recognized source is contradicted by an official Social Security publication." (Pl.'s Mem. at 6-7.)

   As to the latter point, that the O*Net was characterized by the Department of Labor as a replacement for the DOT is of little consequence because the SSA unequivocally determined in 2008 that the O*Net is *not* a reliable source of occupational evidence for SSA disability determination claims.[9] As explained, this is why the SSA is developing its own information system, including implementing regulations, to replace the DOT. However, under Agency regulations, the DOT remains the primary source of reliable job information and work requirements for the Agency at steps four and five of the sequential evaluation process. SSR 00-4p, at 2, 2000 SSR LEXIS 8 at *4.

   Moreover, as Dr. Leviton testified, the addresser position, as defined by the DOT, exists as a representative occupation available to a hypothetical individual matching Plaintiff's age,

---

[9] In 2010, the SSA, the Occupational Information Development Advisory Panel, and the National Academy of Sciences unanimously agreed that "O*NET in its current form is not suitable for disability adjudication" and would require "significant changes" for such use. *See* Occupational Information Development Advisory Panel, *Findings Report: A Review of the National Academy of Sciences Report — A Database for a Changing Economy: Review of the Occupational Information Network (O*NET)* (Jun. 28, 2010), at 1, available at https://www.ssa.gov/disabilityresearch/documents/COMPLETE%20FINAL--Findings%20Report%20OIDAP%20062810.pdf (last accessed Jan. 26, 2023).

education, past work experience, and residual functional capacity. (R. at 57.) Even if the O*Net classified such a position as being inapposite to this hypothetical individual, such classification would be irrelevant to the ALJ's step five findings because the ALJ has no duty to resolve conflicts between the O*Net and the DOT. Thus, there can be no apparent conflict warranting remand based on that alone. Plaintiff attempts to create a conflict by referencing the O*Net and the ALJ's alleged refusal to "allow [Plaintiff's] attorney to question the vocational expert as to conflicts between the information in the DOT and [O*Net]." (Pl.'s Mem. at 5.) However, a review of the transcript shows that the ALJ reasonably limited the scope of counsel's cross examination to the DOT as that it is "what is acceptable by the [SSA]" and was the basis for the vocational expert's findings. (R. at 58.)

Indeed, neither the regulations nor courts within the Fourth Circuit require the ALJ to identify or discuss conflicts between O*Net and the DOT. *See* SSR 00-4p, 2000 SSR LEXIS 8, *4, 2000 WL 1898704, at *2-3 (in making disability determinations, the DOT is the primary source, as well as its companion publication, the Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles). Further, courts within the Fourth Circuit have consistently rejected claimants' reliance on O*Net as the basis for a conflict between a vocational expert's testimony and the DOT.[10] Because the Court does not recognize the O*Net

---

[10] *See e.g.*, *Bushaw v. Berryhill*, No. 1:17-cv-00192-FDW, 2018 U.S. Dist. LEXIS 71218, 2018 WL 1972711, at *5 (W.D.N.C. Apr. 26, 2018) (noting SSR 00-4p, 2000 SSR LEXIS 8 "contains no mention of O*Net" and joining "other district courts in rejecting [claimant's] argument and request to impose an obligation on the ALJ unsupported by law.") (collecting cases); *Street v. Berryhill*, No. 1:17-cv-00204-FDW, 2018 U.S. Dist. LEXIS 68837, 2018 WL 1935866, at *7 (W.D.N.C. Apr. 24, 2018) ("[A]s previously discussed an ALJ is not required to resolve conflicts between the [vocational expert's] testimony and publications other than the DOT. As such, the Court finds no apparent conflict."); *Campusano v. Berryhill*, No. 3:17-cv-499-MOC, 2018 U.S. Dist. LEXIS 54662, 2018 WL 1566332, at *3 (W.D.N.C. Mar. 30, 2018) ("[W]hile [claimant] claims that O*Net replaced the DOT, that appears not to be completely accurate . . . ."); *Fender v. Berryhill*, No. 1:17-cv-00041-RJC, 2018 U.S. Dist. LEXIS 53191, 2018 WL 1536485, at *4

or its contents as creating a conflict between vocational expert testimony and the DOT, Plaintiff must offer other evidence of conflict, which she does not do. The Court finds there is no inconsistency to resolve. As a result, the ALJ made no error in this regard.

### B. The ALJ Provided a Legally Sufficient Narrative Discussion and Substantial Evidence Supports the ALJ's Residual Functional Capacity Findings.

Plaintiff next argues that the ALJ failed to conduct a function-by-function analysis under SSR 96-8p, 1996 SSR LEXIS 5, 1996 WL 374184 [hereinafter "SSR 96-8p"]. (Pl.'s Mem. at 8.) In support, Plaintiff argues that "[a]lthough the ALJ did cite medical records, she never explained how these records supported the conclusions stated in the [residual functional capacity]." (Pl.'s Mem. at 9.) Plaintiff adds that the ALJ "cited the existence of daily activities, but did not examine the frequency and duration of these activities[,]" nor did she "state a logical explanation as to how these activities established that [Plaintiff] had the capacity to work on a sustained basis throughout a normal work week." (Pl.'s Mem. at 9.) "In short, the ALJ did not build an accurate and logical bridge between the evidence and the [residual functional capacity] conclusion." (Pl.'s Mem. at 9.)

Defendant responds that the ALJ's decision "shows that she conducted the analysis required by the regulations and that substantial evidence supports her conclusions." (Def.'s Mem. at 18.) Defendant notes that the ALJ: (1) summarized Plaintiff's progress in recovering from her injuries, which included meeting her physical therapy goals; and (2) relied on the objective testing, as well as Plaintiff's subjective reports of improvement, to support her residual

---

(W.D.N.C. Mar. 29, 2018) ("The Court does not believe that the ALJ has an affirmative duty to seek out and resolve apparent conflicts between the [vocational expert's] testimony and O*Net, especially when the [vocational expert] did not rely on O*Net for their conclusions.")

functional capacity findings, which were "clearly linked to the evidence supporting the [assessed] limitations . . . ." (Def.'s Mem. at 18-19.)

      *1. Legal Standard.*

SSR 96-8p directs the ALJ to consider a claimant's ability to meet the physical, mental, sensory, and other requirements of work when determining the claimant's residual functional capacity. 20 C.F.R. § 404.1545(a)(4). SSR 96-8p explicitly requires the ALJ to "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p, at *7; *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016) A function-by-function analysis requires the ALJ to develop a residual functional capacity which accounts for the work activities the claimant can perform given the physical or mental impairments affecting her ability to work; in doing so, the ALJ must explain the conclusions reached and explain any record evidence which contradicts the residual functional capacity determination. SSR 96-8p; *see also Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016) (explaining that an ALJ needs to provide an explicit explanation linking medical evidence listed in the decision to her ultimate findings). The ALJ is instructed to cite specific medical facts and non-medical evidence supporting her conclusion, discuss the claimant's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis, describe the maximum amount of each work-related activity the claimant can perform, and explain how any material inconsistencies or ambiguities in the evidence were considered and resolved. SSR 96-8p, at *7.

The Fourth Circuit has rejected a "per se rule requiring remand when the ALJ does not perform an explicit function-by-function analysis," but found that "'[r]emand may be appropriate

. . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review.'" *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (citing *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)). In *Mascio*, the Fourth Circuit held remand was necessary, in part, because the ALJ failed to explain how he afforded weight to two residual functional capacity assessments containing conflicting evidence regarding the claimant's weight-lifting abilities. 780 F.3d at 636. In short, remand is necessary when a court is "left to guess about how the ALJ arrived at his conclusions on [a claimant's] ability to perform relevant functions . . ." *Mascio v. Colvin*, 780 F.3d 632, 637 (4th Cir. 2015). However, remand is unnecessary when the ALJ's decision addresses conflicting evidence in the record, such that the court can adequately review how the ALJ came to her conclusion. *Ladda v. Berryhill*, 749 F. App'x 166, 172 (4th Cir. 2018).

       2.  *Summary of the ALJ's Fact Findings.*

The ALJ reviewed Plaintiff's medical records during the relevant period in detail, in addition to explaining Plaintiff's prior history, which included gastric bypass surgery in the 1990s, psychiatric care in 2011, and medical treatment records from 2011 to 2012. (R. at 192, citing R. at 369, 381-461.) The ALJ noted how Plaintiff fell in her home on May 7, 2013, which resulted in a leg injury as well as kidney issues. (R. at 193.) She also summarized how Plaintiff underwent surgery on her leg, received medication and vitamins, and completed physical therapy before she was discharged on June 13, 2013. (R. at 193.) "At that time [Plaintiff] could mostly dress herself, could walk [thirty] feet, and was also given a walker." (R. at 193.) The ALJ remarked that Plaintiff showed improvement throughout the relevant period, noting:

            i.   "She had some improvement by late August, but still had no sensation below her right knee and required a walker to ambulate." (R. at 193.)

16

  ii. "By the fall of 2013 [Plaintiff] reported some improvement to the mobility of her right leg, but also said that she still could not feel anything below the right knee." (R. at 193.)

  iii. Plaintiff attended physical therapy from January 2013 to April 2014, "at which time she had 'done very well.' [Plaintiff] was able to stand at least [twenty] minutes at a time, needed only one crutch to walk around the clinic, and walk at least [three hundred] feet without an assistive device." (R. at 193.)

  iv. In March 2014, Plaintiff's psychiatric nurse practitioner "described [Plaintiff] as stable and responding well to treatment. She was also in therapy by this point, and her counselor generally noted no more than mild symptoms throughout 2014." (R. at 193.)

  v. "Updated nerve testing of [Plaintiff's] leg in the spring of 2014 showed a degree of improvement, and [Plaintiff] said she had 'some' control over her right foot." (R. at 194.)

  vi. In June 2014, Plaintiff returned to her primary care physician, "the first time she had seen this provider in almost a year[,]" and reported that "the pain in her right leg was improving." (R. at 194.)

  vii. By October 2014, Plaintiff reported "good pain control and continued improvement in her mobility[,]" and maintained her treatment regimen. (R. at 194.)

In addition to the medical treatment notes, the ALJ considered the medical opinion evidence from Plaintiff's neurologist, Thomas Smith, M.D. ("Dr. Smith") and a joint medical opinion from Plaintiff's psychiatric nurse practitioner, Paula Allocca, Ph.D. ("Dr. Allocca") and Plaintiff's social worker, Laurie Klatt, LCSW ("Ms. Klatt"). (R. at 194-95.)

Finally, the ALJ considered Plaintiff's subjective complaints, including her testimony and answers to a function report. (R. at 195-96.) Specifically, the ALJ noted Plaintiff's allegations that she "was unable to work due to limitations with sitting (saying she cannot do so more than 10-15 minutes), cannot rise from sitting on her own, needs two canes to walk, and that she has to spend most of her time resting." (R. at 195.) Plaintiff testified that she needed to have a caretaker

assist her with the household "and that she needed help with many daily tasks." (R. at 195.) However, the ALJ wrote that Plaintiff "regularly drives, shops, and reads, can manage money, and had taken online classes[,]" and "alleged similar issues and limitations at the second hearing as well." (R. at 195-196.) After considering Plaintiff's subjective complaints, the ALJ concluded that the record supports "the *types* of limitations that [Plaintiff] has alleged, [but] it does not support their severity." (R. at 196) (emphasis in original.) The ALJ explained:

> The evidence shows ongoing treatment for a variety of issues that could cause both mental and physical limitations. However, that treatment history also shows that those symptoms and limitations are stable with treatment. [Plaintiff]'s treatment history was generally conservative, and most of her conditions were well-controlled with medication and exercise. Furthermore, [Plaintiff]'s descriptions of her capabilities also indicate that her limitations were not as severe as she has otherwise alleged, including driving, shopping, and reading. She also said that she was taking classes online in 2014 and 2015. Finally, the undersigned notes that [Plaintiff]'s complaints to her doctors were generally not as severe as those she has alleged here, and that many of those allegations were focused on times well after her date last insured.

(R. at 196.)

### 3. Analysis of the ALJ's Findings and Narrative Discussion.

Upon review, it is clear that the ALJ's decision includes the narrative discussion required by SSR 96-8p and contains sufficient information to allow meaningful review. Contrary to Plaintiff's complaint that the ALJ failed to explain how she considered the medical treatment records and Plaintiff's activities of daily living when forming the residual functional capacity, the ALJ gave a detailed account of the Plaintiff's medical history and explicitly acknowledged Plaintiff's testimony about her impairments, including the extent to which she can perform certain activities. (Pl.'s Mem. at 9-11) (R. at 192-96.)

For instance, the ALJ: (1) thoroughly evaluated the longitudinal medical evidence regarding Plaintiff's leg pain, anxiety, and depression during the relevant period; (2) explained how Plaintiff's leg pain and mobility improved after surgery, physical therapy, and medication; and (3) included in her assessment a summary of Plaintiff's progress, noting how Plaintiff could "mostly dress herself" in June 2013, but required a walker to ambulate through late August 2013. (R. at 192-94.) At her initial assessment at physical therapy in January 2014, Plaintiff "needed to sit to bathe, but could stand long enough to make breakfast." (R. at 193, citing R. at 954.) Nonetheless, the ALJ noted that by April 2014, Plaintiff "was able to stand at least [twenty] minutes at a time, needed only one crutch to walk around the clinic, and [could] walk at least 300 feet without an assistive device." (R. at 193, referencing R. at 1015.) Moreover, the ALJ acknowledged that Plaintiff's psychiatric symptoms stabilized toward the end of the relevant period, remarking "mild symptoms throughout 2014" with "occasional periods where [Plaintiff]'s symptoms were said to be moderate due to situational and family stressors . . . ." (R. at 193.) However, the ALJ found that Plaintiff's increased symptoms "had returned to their previous level" by early 2015, worsened at the end of that year "due to a combination of deaths in the family and noncompliance with her medication, but . . . improved once she began taking her medication once more." (R. at 193.)

The ALJ also properly weighed the medical opinion evidence in accordance with the governing regulations. (R. at 194-95.) She explained why she gave little weight to Dr. Smith's March 2014 functional assessment on the basis that it was "contradicted by [Plaintiff]'s treatment history and [was] internally inconsistent." (R. at 194.) Specifically, the ALJ noted that Dr. Smith's report was internally inconsistent because he opined that Plaintiff was unlimited in her ability to reach, handle, finger, or feel, but then proceeded to restrict her to being able to

perform these functions only frequently. (R. at 194.) The ALJ also remarked that Dr. Smith "provided little explanation for his findings," and that Plaintiff's "treatment records show greater functioning." (R. at 194.) For example, Plaintiff "had been told during the same timeframe [as Dr. Smith's assessment] to begin increasing her activity levels, and she herself reported improved functioning in her foot." (R. at 194.) Finally, the ALJ discredited Dr. Smith's opinion because he failed to address Plaintiff's cane usage, "despite her need for this being well-supported by the evidence." (R. at 194.)

The ALJ also considered Dr. Smith's March 2017 functional assessment, to which she assigned "partial weight" because it was "mostly consistent with the evidence for the time period under consideration in this finding" despite being completed "well after [Plaintiff]'s date last insured (three years after, to be exact) . . . ." (R. at 194-95.) The ALJ explained that "[t]he evidence shows ongoing issues with [Plaintiff]'s right leg, including reduced mobility and loss of sensation consistent with sedentary work and the postural and other limitations found by Dr. Smith." (R. at 195.) However, the ALJ determined that the evidence did not support the limitations Dr. Smith assessed to Plaintiff's upper extremities, nor did he find that Plaintiff required a cane "despite this being clearly demonstrated by [her] medical history." (R. at 195.)

Plaintiff makes two arguments concerning Dr. Smith's opinions. (Pl.'s Mem. at 12, 13-14.) First, Plaintiff appears to argue that the ALJ should not have discredited Dr. Smith's 2014 assessment on the basis that it was "internally inconsistent" because Dr. Smith may not have appreciated the meaning of the word "frequent" in the context of Social Security regulations. (Pl.'s Mem. at 12.) She notes that a dictionary definition of "frequent" includes relative words such as "normal" and "regular," and argues that "there is no indication that Dr. Smith was using the terms in such a constricted meaning." (Pl.'s Mem. at 12.) However, the plain language of the

20

form completed by Dr. Smith belies this reasoning, which defines "frequently" as "occurring one-third to two-thirds of an 8-hour workday (cumulative, not continuous)." (R. at 1871.) Thus, the ALJ could reasonably infer that Dr. Smith understood the terminology on the form when he completed it; at any rate, the Court will decline to make its own assumptions or substitute its judgment for that of the ALJ. *See Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996).

Second, Plaintiff argues that the ALJ failed to "cite to the specific conflict between the 'treatment records' and Dr. Smith's functional capacity assessment[,]" and that "[w]ithout such a specific comparison and analysis it is impossible to determine whether the ALJ's decision was supported by substantial evidence." (Pl.'s Mem. at 13) In support, Plaintiff alleges that the ALJ failed to "use the explicit procedures" set forth in 20 C.F.R. § 404.1520b when "resolving conflicts in the evidence . . . ." (Pl.'s Mem. at 13.) The undersigned disagrees and finds that the ALJ sufficiently explained why she discredited or accredited Dr. Smith's opinions according to the regulations, particularly when she noted how the opinions were supported by or consistent with the evidence. Although the ALJ did not pin cite to each medical treatment note in her assessment of Dr. Smith's opinions, it is clear which medical records she considered when she weighed Dr. Smith's opinions. As a result, the court is able to follow the ALJ's reasoning and determine whether substantial evidence exists to support the ALJ's findings.

The ALJ next weighed the joint statement submitted by Dr. Allocca and Ms. Klatt, which the ALJ assigned "significant weight" because it was "broadly consistent with [Plaintiff]'s mental health treatment history during the period under consideration." (R. at 195.) The ALJ summarized their statement, noting that they assessed Plaintiff with "slight" limitations in her ability to follow instructions, make simple work-related judgments, and work with supervisors and coworkers; "moderate" limitations in responding to workplace stressors and changes in the

work setting; and no limitations in working with the public. (R. at 195, citing R. at 1640-41.) The ALJ found that Plaintiff's treatment records showed "good effects from medication" and normal mental status findings. (R. at 195.) Plaintiff makes no argument as to whether the ALJ erred when evaluating this joint statement; as a result, the Court considers any such claim regarding it to be waived.

However, Plaintiff briefly contends that the ALJ erred in her assessed mental limitations by failing to account for the interval between the two-hour periods when Plaintiff is able to concentrate on work tasks. (Pl's Mem. at 13.) Specifically, Plaintiff argues that the ALJ failed to: (1) specify how long the break should be; and (2) state "how soon or frequent [sic] [Plaintiff] can be expected to go back on task during an 8-hour work day." (Pl.'s Mem. at 13.) According to Plaintiff, such "failure to address in the [residual functional capacity] assessment of [a claimant's] ability to perform work on a sustained basis has previously been noted to require remand[.]" (Pl.'s Mem. at 13.) However, Plaintiff does not attempt to perform any calculation, present evidence showing that a greater percentage of time should be assessed, or advance any argument with supporting case law or regulations to support her contention that the ALJ erred. Instead, Plaintiff summarily argues that the ALJ's failure to define the length of the break renders the residual functional capacity fatally vague. Absent a fully developed argument, the undersigned finds that the ALJ's inclusion of these specific limitations adequately accounts for Plaintiff's mental impairments and is supported by substantial evidence.

Finally, the ALJ assessed Plaintiff's subjective complaints against the evidence of record and specified how, and why, she found Plaintiff's complaints to be not as severe as alleged. (R. at 195-96.) While Plaintiff may disagree with the way in which the ALJ considered Plaintiff's activities, it is clear that the ALJ assessed the extent to which Plaintiff's impairments limited her

ability to work. Indeed, the ALJ explained how Plaintiff could go to medical appointments, take her medications, shop, drive, read, manage her funds, use the internet, and maintain her personal care and hygiene. (R. at 190-91.) Plaintiff acknowledges that the ALJ noted "various activities" and cited medical records but did not specify the "limited extent of those activities . . . or explain how those activities showed that [Plaintiff] could sustain a full-time job." (Pl.'s Mem. at 8, 9.) However, Plaintiff fails to specify which, if any, limitations the ALJ should have incorporated into her analysis and how that evidence could result in a different outcome. In the absence of a fully developed argument suggesting which mental or physical limitations the ALJ failed to consider and to what extent those limitations preclude Plaintiff from work, the Court finds that the ALJ provided a sufficient narrative discussion that enables meaningful review.

Indeed, the ALJ was only required to identify evidence that supports her conclusion and create a narrative discussion that builds "an accurate and logical bridge from the evidence to [her] conclusion." *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018). In this case, the ALJ complied with this requirement in her discussion of the medical and non-medical evidence, Plaintiff's alleged symptoms, and the medical opinions of record. (R. at 190-95.) Plaintiff's complaints of pain were acknowledged and considered by the ALJ, and the ALJ provided reasoning for her conclusion that despite her pain and symptoms, Plaintiff could perform a limited range of sedentary work. Thus, the ALJ provided a narrative discussion explaining her conclusions, cited medical and non-medical evidence, discussed Plaintiff's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis, and considered "all symptoms and the extent to which [they] can reasonably be accepted as consistent with the objective medical evidence and other evidence . . . ." (R. at 192.) Therefore, the ALJ's narrative discussion of all the evidence in support of her findings in determining

Plaintiff's residual functional capacity was sufficient to comply with the function-by-function analysis under SSR 96-8p.

### C.  The ALJ Properly Evaluated Plaintiff's Past Relevant Work.

Plaintiff lastly argues that a "serious conflict" exists between the ALJ's assessed residual functional capacity and her finding that Plaintiff could not perform her past relevant work as a night auditor. (Pl.'s Mem. at 14.) Plaintiff explains that since her prior relevant work is classified as sedentary and "did not appear to involve exertions in excess of the stated residual functional capacity," the ALJ must have erred by finding that she could not perform this prior work. (Pl.'s Mem. at 14.) Presumably, then, Plaintiff contends that the ALJ committed reversible error by failing to explain this alleged inconsistency. (Pl.'s Mem. at 14.)

Defendant responds that, at the outset, Plaintiff's argument "has no bearing on the outcome of the case" because, "[i]f Plaintiff were able to perform her past sedentary work as she suggests, she would not be disabled . . . ." (Def.'s Mem. at 22.) Defendant then explains how the ALJ "assessed *additional* limitations beyond a restriction to sedentary work" that "prevented Plaintiff from returning to her past relevant work." (Def.'s Mem. at 22.) Indeed, as Defendant correctly points out, the ALJ asked Dr. Leviton if Plaintiff could return to her past relevant work given the hypothetical individual matching Plaintiff's residual functional capacity, age, and education. (R. at 55.) Dr. Leviton responded "I'm gonna say no because of the only occasional contact with supervisors, coworkers, and the public." (R. at 55.) Dr. Leviton then confirmed that a hypothetical person with Plaintiff's social limitations could perform the jobs she identified and upon which the ALJ relied. (R. at 197-98.) The undersigned agrees with Defendant that there is no conflict between the ALJ's residual functional capacity determination and her step four findings; therefore, the court finds no error warranting remand.

24

## V. CONCLUSION

For the reasons set forth above, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 18) be DENIED, Defendant's Motion for Summary Judgment (ECF No. 19) be GRANTED, and that the final decision of the Commissioner be AFFIRMED.

Let the clerk forward a copy of this Report and Recommendation to Senior United States District Judge Henry E. Hudson and to all counsel of record.

### NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

_____ /s/ MRC
Mark R. Colombell
United States Magistrate Judge

Richmond, Virginia
Date: January 26, 2023

25